**Myron P. NOBLER, Plaintiff,**

v.

**BETH ISRAEL MEDICAL CENTER, Defendant.**

**No. 87 Civ. 0569 (RWS).**

United States District Court,
S.D. New York.

Dec. 20, 1988.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City (Judith P. Vladeck, of counsel), for plaintiff.

Proskauer Rose Goetz & Mendelsohn, New York City (Allen I. Fagin, Bernard M. Plum, Donald B. Shanin, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Defendant Beth Israel Medical Center ("BIMC") has moved pursuant to Rule 56 of F.R.Civ.P. for summary judgment to dismiss the complaint of plaintiff Dr. Myron P. Nobler ("Nobler"). Nobler alleges that BIMC failed to promote him for Directorship of BIMC's new Radiation Therapy Department because of his age in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"), and that as a result of this discrimination, he was forced to resign from BIMC. For the reasons set forth below, BIMC's motion, which was argued on September 7, 1988, is denied as to Nobler's claim of failure to promote. The motion for summary judgment is granted on the constructive discharge claim.

*Facts*

Nobler is a specialist in the field of radiation therapy. He is 56 years old. In 1967, Nobler was hired by BIMC to develop its Division of Radiation Therapy. Under his leadership, the division became one of the best radiation therapy units in New York City. In addition, in 1968, Nobler was appointed Assistant Professor of Radiotherapy at Mount Sinai School of Medicine ("Mount Sinai"), and in 1977 was promoted to Associate Professor.

Throughout Dr. Nobler's employment by BIMC, radiation therapy and diagnostic radiology were combined in one department, the Department of Radiology and Radiation Therapy. The Director of the Department was Dr. Norman Leeds ("Leeds"), a diagnostic radiologist who was selected by a search committee in 1984. Nobler was Chief of the Department's radiation therapy division, and reported directly to Leeds.

In early 1985, BIMC established the Kriser Lung Cancer Center (the "Kriser Center") and hired Dr. Edward Beattie ("Beattie") to be Director of the Kriser Center and Chief of Thoracic Surgery. Beattie was 69 years old. To complement the heightened focus on cancer treatment that would result from the establishment of the Kriser Center, in July, 1985, BIMC decided to separate its Department of Radiology and Radiation Therapy into two departments: a Department of Radiology and a Department of Radiation Therapy.

BIMC is affiliated with Mount Sinai for purposes of teaching, research and faculty appointments. Under the terms of BIMC's affiliation agreement with Mount Sinai, BIMC department directors must be chosen by a search committee appointed by the Dean of Mount Sinai and composed of doctors from BIMC and from the Mount Sinai Medical Center ("MSMC").

Pursuant to the agreement between BIMC and Mount Sinai, Dr. Robert Newman ("Newman"), President and Chief Executive Officer of BIMC, recommended four BIMC faculty members for service on a Search Committee (the "Search Committee" or the "Committee") to select a director for BIMC's new Radiation Therapy Department, all of whom were officially appointed to the Committee by the Dean of Mount Sinai. The four members were Leeds, Director of Radiology and Radiation Therapy; Dr. Robert Wallach, Director of Obstetrics/Gynecology and head of BIMC's Cancer Committee, Dr. Ralph Zalusky, Associate Director of Medicine specializing in Hematology/Oncology; and Dr. Bernard Kabakow ("Kabakow"), an Oncologist and member of BIMC's Department of Medi-

cine. Newman also served on the Committee. In addition, five physicians from MSMC were appointed by Mount Sinai's Dean, but only two of them were active on the Committee: Dr. William Bloomer ("Bloomer"), Chairman of Mount Sinai's Department of Radiotherapy and Dr. Angelos Papatestas, Professor of Surgery. The average age of the men actively serving on the Committee was 51 years old.

In the autumn of 1985, the Search Committee reviewed the curriculum vitaes (CVs) of six candidates, ranging in age from Dr. Bhadrasian Vikram ("Vikram"), who was 36 years old, to Dr. Basil Hilaris ("Hilaris"), who was 57. Nobler, at 53, was the second oldest candidate after Hilaris. Following examination of the CVs, the Committee met separately with each candidate and discussed with them their ideas for the development of the new department.

The Search Committee did not have formal guidelines for criteria to apply in selecting a Director. According to Leeds, the Committee sought a director with substantial leadership skills and achievements, and one who had a "vision" for the department's growth and development. Leeds Dep. 25–26. Newman, too, said that a candidate's leadership abilities and goals for the future of the Department were important:

> [t]he committee was looking for somebody that could develop the new Department of Radiation/Oncology as a major force within the medical center, a service of renown throughout the city and hopefully beyond the city.... We wanted a candidate who would convey a sharing of the sense of excitement that existed certainly among the Beth Israel members of the search committee regarding the opportunity, regarding the potential, regarding where the department would be brought to in the next three year and five years.... We wanted a leader of the department that we viewed as being one of the tremendous forces in the future of the medical center.

Newman Dep. 80–81. Further, according to Newman, the Committee looked for "somebody who would have the respect and the admiration of physicians within the medical center, who would have the respect and admiration of the people in the general community." Newman Dep. 81. *See also* Leeds Dep. 27–28:

> The message was loud and clear ... [our goal was] to choose the best possible person to lead a new department of radiation oncology, who would be both a therapist, an innovator and a leader in the field and do both clinical work and research and build a strong department.

In December 1985, after the Search Committee had met once with each candidate, the Committee divided the candidates into two groups, and, according to Nobler, ended its consideration of the candidates in the lower group. Two of the three candidates in the lower group were Nobler and Hilaris. At ages 53 and 57, respectively, Nobler and Hilaris were the oldest candidates; the remaining candidates were 36, 38 and 42. According to Newman, he told Nobler that he was still under consideration by the Committee, but that he was no longer among the top three candidates. Newman Dep. 92–93. Nobler, however, contends that Newman told him that the field had been narrowed to three candidates, and that he was not among them. Nobler Dep. 147. Testimony by other Committee members confirms that the Committee eliminated Nobler from consideration in December 1985.

According to BIMC, Hilaris was eliminated by the Committee as a potential director in part because of his physical condition— he had suffered two coronaries and a bypass—and in part because his ideas for the department would have required large amounts of money to implement. In connection with the discussion on Hilaris, Dr. Kabakow also mentioned his age as a consideration of the Committee.

In explanation of Nobler's rejection, members of the Selection Committee have stated that in his interview before the Committee Nobler focused on his past accomplishments rather than on a new plan for the future of the Department. *See, e.g.,* Bloomer Dep. 68. *See also* Nobler Dep.

143–44. Leeds, for example, stated that Nobler's major drawback "was the fact that he didn't provide ... a plan that I could see that was creative, that was new, that was innovative, that was going to be different." Leeds Dep. 26–27. Similarly, Kabakow, Nobler's most ardent supporter, said that Nobler "did not project anything new for the future." Kabakow Dep. 33. According to Nobler, however, he discussed his plans for expansion of work in the field of radiation therapy. For example, he told the Committee of his plan to establish BIMC as a center for hyperthermia, something that at least one of the three finalists has espoused, and told the Committee of his plan to obtain advanced equipment for the department. In addition, Committee members have said that he was not as strong academically as some of the other candidates. *See e.g.,* Kabakow Dep. 22–23, Bloomer Dep. 53–54.

After a second round of interviews with two of the top three candidates (the third candidate had withdrawn voluntarily from consideration), the Committee unanimously recommended Vikram for appointment as Director of Radiation Therapy. Bloomer Dep. 83–84; Leeds Dep. 19–20. Vikram was a nationally known radiotherapist, and an expert in the treatment of neck and throat cancer.

In January 1987, Nobler filed a complaint against BIMC alleging that he was turned down for the Directorship of the new Department because the Committee was impermissibly seeking a younger director. According to Nobler, Newman had informed him in August, 1985 that a plan to expand the Division was being implemented, and that a Search Committee would be formed to select a new director. When Nobler expressed interest in being the director, Newman told him: "what we're really looking for is ... a rising star. We're looking for someone who will be tremendously dynamic and forceful and will become—and will make Beth Israel become world famous in the field of radiation therapy." Nobler Dep. 18–20. Similarly, after the formation of the Committee, Bloomer explained to Nobler that the Committee sought "new blood," "fresh faces" and

"fresh ideas," Nobler Dep. 31–32; Leeds also used these phrases to describe to Nobler what the Committee was seeking in a director. Nobler Dep. 40. Nobler believes that Dr. Kabakow used them as well. Nobler Dep. 48, 61–62. In addition, Leeds testified that the Committee was concerned with choosing "the individual who we thought would provide the best leadership of a new section into the next century." Leeds Dep. 25.

When Newman told Nobler in December 1985 that he was not among the top three candidates, he praised Nobler as a "super clinician and an excellent doctor" and said that he hoped that Nobler would stay on as a member of the new Department. Nobler Dep. 151. Although Newman exhibited his interest in keeping Nobler at BIMC, Newman advised Nobler that if he were in Nobler's shoes, he would look for a job elsewhere. Nobler Dep. at 150. Again, in April 1986, after Vikram's appointment as Director of the Department of Radiation Therapy became official, Newman made a remark to Nobler about wanting him to stay on at BIMC. Nobler Dep. 155. Finally, later in April, 1986, Vikram told him: "you can stay if you want, you can leave if you want." Nobler Dep. 157; 232–33. Despite these statements that Nobler could remain at BIMC, he began to look for a new job as soon as he learned that he was not a serious contender for the position as Director, and he continued his search after the selection of Vikram.

When Nobler requested a salary increase in 1986, his salary exceeded the top range for faculty at his level by $9000. None of the nearly 40 staff members whose salaries exceeded their range received an increase in 1986. Despite this, in June 1986, Nobler received an increase in private practice income supplement retroactive to January 1, 1986. He alone of all BIMC employees with salaries exceeding the normal range received a retroactive salary increase.

Before submitting his resignation, Nobler did not discuss with Newman, Vikram or anyone else his title, income or responsibilities in the new Radiation Therapy Department, nor did he request a post as

Assistant Director, and as long as Nobler stayed at BIMC, his job duties and responsibilities did not change. Furthermore, there was no practice of appointing the incumbent candidate as department director. Although this was done in two cases, it was not done in two others.

Nobler resigned from BIMC in August, 1986, several months after Vikram was chosen by the Search Committee to become Director of the Radiation Therapy Department, but one month before the new department was established and before Vikram began work at BIMC. Prior to his resignation, Nobler accepted a position as Associate Director of Radiation Therapy at Albert Einstein Medical Center in Philadelphia.

*Applicability of Summary Judgment and Burden of Proof*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted when no material issue of fact exists. The court's responsibility is to determine whether there are any factual issues to be tried while resolving ambiguities and drawing inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985). Further, "mere speculation or conjecture" is not enough to defeat a motion for summary judgment. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Nobler's complaint was brought under ADEA, which provides: "it shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The standards concerning burden and order of proof in Title VII cases apply to cases arising under the ADEA. *Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir.1983) (citations omitted).

To make a *prima facie* case of employment discrimination based upon age, plaintiff must show (1) that he was a member of the protected age group, that is, between forty and seventy years; (2) that he applied for, but did not receive the particular position; (3) that another person outside of the age group received the position; and (4) that he was qualified to fill the position sought. *EEOC v. Trans World Airlines, Inc.*, 544 F.Supp. 1187, 1218 (S.D.N.Y. 1982). Once the *prima facie* case has been established, the employer must articulate legitimate, non-discriminatory reasons for the action. Then, if defendant has carried its burden, the burden shifts back to plaintiff to show by a preponderance of the evidence that the proffered reasons were a pretext for discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

*Failure to Promote*

BIMC does not dispute that Nobler has made a *prima facie* case of age discrimination. At age 53, Nobler was a member of the protected age group; he applied to be director of the Department of Radiation Therapy; he was qualified for the position; he was not hired; and instead, Vikram, then 36 years old, was named as the new Director. Further, BIMC has offered legitimate, non-discriminatory reasons for the Search Committee's selection of Vikram and rejection of Nobler. The selection of Vikram was made by a Committee of eminent physicians, medical scholars and administrators from two medical and teaching institutions. The criteria they applied included assessments of candidates' academic, clinical and leadership abilities. Especially important was the ability of the candidate to present an inspiring plan—a "vision"—for the future of the new Department. *See, e.g.*, Leeds Dep. 25–26. The Committee members testified that they chose Vikram because they believed that he was the best, most inspiring, and most exciting candidate for the job. However, Nobler's evidence raises a triable issue of fact concerning pretext.

To raise a triable issue as to pretext, Nobler does not have to provide evidence to show that age was the sole factor in BIMC's employment decision, *Geller v. Markham*, 635 F.2d 1027, 1035 (2d Cir. 1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1985), nor does he have to show that the reasons offered by BIMC are false. *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (1983). All he has to show is that the reasons were not BIMC's only reasons "and that age made a difference." *Id.* (citations omitted).

Nobler contends that BIMC's stated justification for its selection of Vikram is pretextual based upon a number of factors. First is the difficulty the Committee members had in explaining the basis of their decision. For example, Nobler cites Newman's testimony that, in trying to explain to Nobler why he was not chosen, he said: "there just wasn't a specific answer to that type of question ... there are many things which go into the ranking of candidates including subjective reactions to what is said in the search committee process...." Newman Dep. 96.

Nobler also claims that because Leeds, Bloomer and Kabakow relate differing descriptions of the Committee process, and Newman cannot recall which three doctors were in the top group of candidates in December, there is an issue as to the Committee's good faith in choosing Vikram rather than Nobler. Further, according to Nobler, Leeds' testimony that the Committee reached consensus decisions, but that he did not know which candidates Bloomer or Newman favored, is inconsistent, and thus raises an inference that Leeds is hiding something.

However, it is speculation for Nobler to contend, as he does, that "[b]ecause the committee members cannot even remember the steps they took to arrive at the selection of Dr. Vikram, it is probable that the reasons now offered as justification for these steps are not remembered, but rather have been constructed to fend off the present suit." Plaintiff's Memo. of Law at 35. Such speculation cannot bar summary judgment.

Nobler also argues that the Committee did not, despite later claims, make searching inquiries into the backgrounds of the candidates, and that the examination of candidates' academic records was cursory, despite the fact that Committee members mentioned academic strength as a factor in their decision. Further, Nobler challenges as untrue the reason given by the Committee for selecting Vikram that his capacity would complement the Kriser Center, alleging that the Committee never consulted with Beattie, head of the Kriser Lung Cancer Center, to determine which candidate he felt would best complement the Center. Finally, Nobler points out that BIMC stressed Vikram's plan for the future as a reason for choosing him, but notes that the Committee members have difficulty recalling the specifics of his presentation or future plans. For all of these reasons, Nobler asserts that he has "pointed to evidence of inconsistencies and implausibilities in the employers's proffered reasons ... which *could* support an inference that the employer did not act for nondiscriminatory reasons." *Sorba v. Pennsylvania Drilling Co.*, 821 F.2d 200, 205 (3d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988) (citing *Chipollini v. Spencer Gifts Inc.*, 814 F.2d 893, 900 (3d Cir.), *cert. dismissed* — U.S. —, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987)). *See also Zahorik v. Cornell University*, 729 F.2d 85, 93 (2d Cir.1984) ("[d]epartures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process were the departure may reasonably affect the [employment] decision."). However, these arguments do not raise a material question of fact. To equate lack of recollection with improper motives is speculation. In addition, Nobler's contentions that he was more qualified than Vikram will not support an argument based upon pretext, for a candidate's assessment of his own qualifications is not enough for that purpose. *See, e.g., Lieberman v. Gant*, 630 F.2d 60 (2d Cir.1980). Nobler has not shown by these arguments that "age made a difference." *Hagelthorn v. Kennecott*, 710 F.2d at 82.

Nevertheless, Nobler has established that comments allegedly made by Newman, Bloomer, Leeds and possibly Kabakow support an inference of age discrimination, defeating BIMC's summary judgment motion. In particular are the statements that the Committee was looking for "new blood," a "fresh face" and "a new outlook." When all inferences are drawn on Nobler's behalf, these statements can reasonably be considered as evidence of discriminatory motives, thus raising a triable issue as to the pretextual nature of BIMC's reasons for not hiring Nobler.

In addition to the comments of Committee members are Kabakow's explanations of why Hilaris was dropped from consideration. Although Kabakow discussed that Hilaris was rejected because of his controversial and expensive approach to cancer treatment and his serious health problems, Kabakow also mentioned his age as a consideration.

Although the phrases "rising star," "new blood," "fresh faces" and "fresh ideas" can be construed to refer to a preference for a director chosen from outside of BIMC—and given the Committee's emphasis on a new plan or vision for the Department, a preference for bringing in a director from outside of BIMC is not surprising—they can also be seen as metaphors for youth. Similarly, Leeds' deposition testimony that the Committee was looking for "the best leadership ... into the next century," Leeds Dep. 25, can infer that the Committee was engaged in a "quest for youth," as Nobler construes it, particularly given the proximity of Nobler's retirement and the advent of the year 2000. A jury could infer, although with difficulty, that the Committee was acting discriminatorily by rejecting Hilaris at an early stage.

The defendant must rebut any inference of discrimination by a preponderance of the evidence by showing that the same decision would have been reached absent the pres-

ence of the discriminatory factor. *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir.1983) *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1976).

Thus, drawing all inferences on behalf of Nobler, a material issue of fact exists as to whether the Committee chose Vikram over Nobler because he was 17 years younger, and whether the decision not to promote Nobler would have been reached absent age discrimination. *See Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1986).[1] BIMC's motion for summary judgment on Nobler's ADEA claim for failure to promote him as head of the new Department of Radiation Therapy at BIMC is therefore denied.

*Constructive Discharge*

Nobler contends that his resignation was a constructive discharge by BIMC. Because there is no evidence of age discrimination, Nobler's claim of constructive discharge based upon age discrimination must fail. However, even if BIMC's motion for summary judgment to dismiss the claim of discrimination on the basis of age should fail on the basis of controverted fact or otherwise, Nobler has failed to establish that such discrimination reached the level of constructive discharge entitling him to recovery.

*Pena v. Brattleboro Retreat* articulates the standard for constructive discharge cases in the Second Circuit: "a constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" 702 F.2d 322, 325 (2d Cir.1983) (quoting *Young v. Southwestern Savings and Loan Assn.,* 509 F.2d 140, 144 (5th Cir.1975)).[2] Further, for an

---

**1.** In addition, the fact that Vikram was the only one of BIMC's thirteen Department Directors to be under 40 does not in and of itself establish that the stated ground of the Committee's decision was a pretext. To reach such a conclusion

would preclude the hiring of any division head younger than Nobler.

**2.** The Second Circuit does not require the showing of a deliberate attempt by the employer to bring about the employee's resignation. *Grant*

employee's resignation to amount to a constructive discharge, "the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Pena* (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)).

Subjective feelings held by an employee as to the intolerable nature of his or her position are not sufficient to lead to a finding of constructive discharge. *Neale v. Dillon*, 534 F.Supp. 1381, 1390 (E.D.N.Y.), *aff'd mem.*, 714 F.2d 116 (2d Cir.1982). *See also Wardwell v. School Bd. of Palm Beach County, Fla.*, 786 F.2d 1554, 1558 (11th Cir.1986) (frustration and embarrassment of a female assistant director of transportation who was denied promotion to position of acting director of transportation for the school system, together with increased workload, did "not rise to the intolerable level at which a reasonable person would feel compelled to resign," and thus no constructive discharge was found); *Bourque v. Powell Electrical Manufacturing Company*, 617 F.2d 61, 65 (5th Cir. 1980) (compensation to a female worker at levels lower than those earned by males holding the same job, while unlawful and disappointing, was insufficient to support a finding of constructive discharge). Similarly, humiliation or hurt pride caused by an adverse employment decision or by failure to promote does not constitute constructive discharge, unless, perhaps, the employee would encounter "almost daily, face to face dealings with the alleged wrongdoer or where the nature of the substituted job is unreasonably inferior to his prior position." *Alicea Rosado v. Garcia Santiago*, 562 F.2d at 119–20 n. 4. *See also Neale v. Dillon*, 534 F.Supp. at 1390.

Nobler claims that his freedom to perform his job and his responsibilities changed radically, largely because he would no longer have responsibility for shaping or administering BIMC's radiation therapy program. This decline in responsibilities, he contends, was in essence a de-

motion to the position of staff physician, which was made worse by the fact that Vikram would be walking into a practice built up by Nobler. Nobler also contends that BIMC departed from its "custom" in not appointing Nobler the associate director of the department after he was denied directorship. In addition, Nobler argues that there was an attempt to deprive him of a routine salary increase in 1986.

No factual issue has been presented with respect to the working conditions in which Nobler found himself prior to his resignation. Although Nobler's letter of resignation dated August 1, 1986 states that "[t]he circumstances surrounding the appointment of Dr. B. Vikram to replace me as Chief of Radiation Therapy, after 19 years of loyal dedicated, hard work in that position, make it impossible for me to continue to practice medicine at Beth Israel Medical Center," this letter was sent before the new Department was established and before Vikram began to work at BIMC.

The facts establish that Nobler's responsibilities and duties under Vikram had not been established by the time of his resignation, that no policy has been established by BIMC with respect to creating an Associate Director post, that Nobler never requested appointment to such a post, and that in effect his request for increased compensation was granted prior to his resignation. Nobler's work conditions had not yet changed in any respect, and Newman, BIMC's President, had twice asked Nobler to stay at BIMC. Indeed, in his letters to prospective employers, Nobler wrote that his position at BIMC was secure.

Because Vikram had not yet arrived at BIMC, Nobler could not know what his new conditions would be, and any claim that his situation would be drastically different or that his salary would be cut is speculative. Further, Nobler testified that he would have had little contact with Newman and Bloomer, the two he felt were primarily responsible for his non-selection. Nobler Dep. 55–6, 334–335, 347–48.

Discriminatory denial of promotion cannot, without more, constitute constructive discharge. *See, e.g., Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1256 n. 4 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir.1982); *Grigsby v. North Mississippi Medical Center, Inc.,* 586 F.2d 457 (5th Cir.1978). Nobler has therefore failed to establish that his resignation amounts to constructive discharge. He has thus failed to prove a *prima facie* case of discriminatory loss of employment.

*Conclusion*

Pre-trial discovery in this case has been substantial. Numerous depositions and affidavits are offered in support of the parties' positions. Despite the magnitude of the record, the only triable issue raised by Nobler is whether the comments of the Committee members indicate that, but for his age, Nobler would have been promoted to the position of Director of BIMC's Radiation Therapy Department. BIMC's motion for summary judgment is therefore denied with respect to his claim of denial of promotion, and granted with respect to his claim of constructive discharge.

It is so ordered.