**Roy MORSER, Plaintiff,**

v.

**AT & T INFORMATION SYSTEMS, Defendant.**

**No. 86 Civ. 8594 (RWS).**

United States District Court,
S.D. New York.

Jan. 13, 1989.

As Amended Feb. 9, 1989.

---

Vladeck, Laura S. Schnell, and Jennifer L. Braun, of counsel).

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for defendant (Daniel A. Rizzi, of counsel).

## OPINION

SWEET, District Judge.

Defendant AT & T Information Systems ("AT & T–IS") has moved pursuant to Rule 56, Fed.R.Civ.P., for summary judgment to dismiss the age discrimination complaint filed by plaintiff Roy Morser ("Morser"), a 58 year old employee laid off during AT & T–IS's massive 24,000 employee reduction-in-force during 1985 and 1986. On the facts and conclusions set forth below, AT & T–IS's motion is granted and the complaint is dismissed.

*The Parties*

AT & T–IS is a corporate entity established following the court-ordered breakup of the American Telephone and Telegraph Company, effective January 1, 1984. *United States v. American Telephone & Telegraph Co.*, 552 F.Supp. 131 (D.D.C. 1982), *aff'd*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). AT & T–IS was established to market telephone and computer products that the divestiture permitted AT & T to manufacture and sell for the first time.

Morser was employed with an AT & T entity from 1962 until 1985, first with Western Electric Company ("Western Electric"), then with AT & T Technologies ("Technologies"), and finally with AT & T–IS.

*Prior Proceedings*

Following his discharge, Morser filed age discrimination charges with the New York State Division of Human Rights and the Equal Employment Opportunity Commission ("EEOC") on April 28, 1986. On November 10, 1986, Morser filed the complaint in this action, alleging that AT & T–IS violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*, when it laid him off as part of a large-scale reduction of its work force.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff (Anne C.

On December 30, 1986, AT & T–IS filed its answer and affirmative defenses.

Discovery proceeded, depositions of Morser and several present and former AT & T–IS employees where taken, and documents were exchanged. AT & T–IS has moved for summary judgment, supporting its motion with the fact affidavits of Ruthanne Dooley, Dana M. Becker, Edward A. Chapman, Jr., Gerald M. Lewis, Michael Magnini, John P. McCormick, James Sheridan, and George Whitney. Morser has submitted his affidavit, as well as the fact affidavits of Albert J. Werner, Jr. and Joseph F. McTiernan. Both parties have submitted statements under Local Rule 3(g) ("3g Statement"). The motion was heard and considered fully submitted on October 21, 1988.

*The Facts*

The following facts are found on the basis of the affidavits and the 3(g) Statements. No factual controversy has been presented, although the conclusions to be drawn from these facts are sharply disputed.

*Morser's Employment History*

Morser graduated with honors from the College of William and Mary in 1950 and received a masters degree in American History from the University of Miami in 1951. After his schooling, Morser worked in Florida for the Air Force Missile Test Center and for a technical writing company before moving to New York City in 1957 to work as chief editor for Renwar, Inc. ("Renwar"), a technical writing firm. He left Renwar for approximately one year to work as chief editor for another technical writing firm, Technographic Publication, Inc., and then returned to Renwar as production manager. A year and a half later, Morser began working for G.P. Technical Services, Inc., where he performed writing and editing services for Western Electric.

In April 1962, Morser accepted a position as a Public Relations Specialist in Western Electric's advertising department. Within a year and a half, he was promoted to Section Chief and to department chief within another year. At Western Electric, Morser held a variety of positions, including department chief of Marketing, feature editor on the company magazine, department chief of Corporate and Product Identification, and finally staff manager in the Exhibits and Displays Division ("Exhibits").

As a staff manager in Exhibits, Morser's duties included conceiving exhibits and displays, supervising their technical design, drawing, and copy writing, managing the bid process relating to their construction, overseeing their construction deadlines, and ensuring their safe transportation to the relevant exhibit or display sites. The exhibits and displays for which Morser was responsible were designed for a wide variety of purposes, including use in AT & T annual meetings, corporate office lobbies and reception areas, open houses at Western Electric plants around the country, other industries' trade shows and other public relations events, and public functions such as Chambers of Commerce events.

In 1979, Morser was assigned the additional duty of managing Western Electric's Advanced Communications Center, located at 435 Hudson Street, the largest operating technical showroom of telephone and related equipment in the country. At the same time, he continued his responsibilities as a staff manager in Exhibits.

Western Electric became Technologies in 1983, and the Advanced Communication Center closed on August 31, 1984. Technologies continued to employ Morser at the same salary he had earned as Exhibits staff manager. Morser also continued to manage the equipment warehouse located in the basement of 435 Hudson Street and its staff.

By 1984, Morser and the group with whom he worked provided almost all of the equipment AT & T–IS required for its displays and exhibits. As of January 1, 1985, Morser's group was transferred from Technologies to AT & T–IS's Exhibits and Promotions Division (the "Division"). Mitchell Kirby ("Kirby") supervised Morser's group and reported to Joseph Waters ("Waters"), the Division Manager. The group continued to work at 435 Hudson Street, and was

referred to as the "435 Hudson Street Group."

The Division performed a variety of marketing functions. It principally was responsible for planning, setting up, and managing AT & T–IS exhibits at national, regional, and local trade shows throughout the United States, at which AT & T–IS exhibited its newest products. It also was responsible for managing various customer positioning events such as AT & T–IS-sponsored golf and tennis tournaments.

In April 1985, AT & T–IS transferred Morser to a position at One Exchange Plaza to assist Edward Chapman, District Manager, ("Chapman"), in the areas of transportation, field support, administration, office management, and future planning. His primary responsibility was to design, establish, and run a uniform nationwide freight management system.

Waters testified that Morser's position changed in April 1985 because of concern for Morser's health and because Morser was not getting along with his subordinates. In his affidavit, Morser stated that he had had no health problems, had not missed a day of work, and had no problems getting along with the employees he supervised.

When AT & T–IS discharged Morser on October 31, 1985, he was 58 years old, had been with the company more than 23 years, and was earning approximately $55,000 per year.

*AT & T–IS's Reduction–In–Force*

On August 21, 1985, AT & T–IS announced a large-scale reduction-in-force that was to eliminate 24,000 jobs throughout the organization. The company scheduled 18,000 of the job reductions for 1985 and 6,000 for 1986. About 30% of the jobs eliminated were in management, with the remainder coming from support, factory, and clerical positions.

AT & T–IS announced and explained the reduction-in-force to its employees in a Bulletin, dated August 21, 1985. The Bulletin advised that all management employees in "surplus areas" of the organization would receive a financial incentive for leaving voluntarily. This financial package, called the Management Income Protection Plan ("MIPP"), was based on each participating employee's seniority and annual salary at the time of termination. The company required employees to accept or decline the MIPP by no later than October 4, 1985. AT & T–IS provided information regarding MIPP in an information package called the "Management Employee Communication Package 1" ("Package 1").

The Bulletin further explained that if AT & T–IS could not achieve sufficient reductions in its work force through voluntary separations, the company would lay off employees on October 31, 1985, unless it could find other jobs for them. AT & T–IS helped employees find employment with other AT & T entities and outside of AT & T by, among other things, setting up job requisition centers, establishing a computerized job matching system, holding job fairs, and creating an 800 "jobs hotline" phone number. In addition, supervisors monitored and followed up job leads for their respective employees. The company made clear, however, that the ultimate responsibility for finding another job rested with each employee. AT & T–IS's efforts to place Morser in another job proved unsuccessful.

AT & T–IS also paid a separation allowance to employees who declined the voluntary MIPP payment and ultimately were laid off. The amount of the "voluntary" and "involuntary" separation allowances were the same. They differed only according to the method of payment, with payment under the voluntary separation allowance occurring in installments over a 24–month period and payments under the involuntary separation allowance occurring in a lump sum. AT & T–IS provided information regarding the involuntary separation plan in an information package called the "Management Employee Communication Package 2" ("Package 2").

AT & T–IS conducted the reduction-in-force pursuant to guidelines the company's personnel department formulated ("the Guidelines"). The first step involved determining the employee groupings, called

"universes," from which the layoffs would occur. The managers in each organization established the universes by grouping employees within a particular organization at a certain management level or at a certain location or performing a certain job function, or any other logical grouping.

After setting the universes, the managers in each organization could "protect" up to 40 percent of the employees within each universe. By doing so, AT & T–IS hoped to retain employees with essential skills and strong performance. Toward this end, managers designated protected workers according to various criteria.

One criterion was whether the employee had received a Special Merit Award ("SMA") for his or her 1984 performance. An SMA is a monetary award for meritorious performance given to no more than the top 30 percent performers in a particular organization.

Another criterion was whether the employee had special skills or knowledge that would be helpful to the company in the future. AT & T–IS was particularly interested in retaining employees who had data skills—the sales, marketing, configuration, and installation of computers—so it could take full advantage of its opportunity to manufacture and market computers and computer systems for the first time.

AT & T–IS required managers to give reasons, in summary form, for protecting non-SMA employees. The reasons the managers offered included "data skills," "performance," "computer skills," "critical skills," "processing," "critical needs of the business," "IBM/Rolm strategy," "special operations," "education market," "line sales management," "Centrex rebuttal," "potential," "future potential," and "future potential in the business."

The use of an apparently age-related description does not correlate with age. Of the 36 protected non-SMA employees in Morser's organization, the twelve whom managers described with words such as "potential" or "future potential" ranged in age from 28 to 38 with an average age of 33.41 while the other 24 ranged in age from 24 to 47 with an average age of 33.70.

Gerald Lewis ("Lewis"), the personnel officer who required managers to provide reasons for protecting non-SMA employees, stated in his affidavit that terms as "potential" or "future potential":

> had nothing whatsoever to do with age. Rather, these terms were clearly understood to refer to the immediate and future contribution that certain employees could make to the organization because of their *skills and capabilities.*

(Emphasis in original).

Ruthanne Dooley ("Dooley"), the person responsible for collecting and summarizing the information for Lewis, stated in her affidavit:

> [T]he major emphasis and goal of the downsizing process was to identify the functions that our organization could continue to perform given the limitations imposed by the loss of more than 25% of our workforce and then to retain, based on their performance, skill set and job duties, those employees who could best perform the functions that remained and contribute to the success of the ongoing (albeit reduced) organization.

When AT & T–IS offered protected employees the voluntary separation allowance, it reserved the right to refuse their request if it found these employees' skills and performance essential to the company's ongoing operations.

Once managers designated the protected employees in each universe, they listed the remaining employees in the order of their seniority, with more senior employees coming ahead of those with fewer years of service. Depending upon the number of reductions required in each universe, these nonprotected employees fall into two categories—"not-at-risk" and "at-risk." At-risk employees were subject to layoff on October 31, 1985 if a sufficient number of protected or not-at-risk employees above them in their universe did not volunteer to leave the company.

For example, if the universe was comprised of 20 employees and management elected to protect eight (up to 40%), the remaining 12 employees were listed in the

order of their seniority. If 6 layoffs had to be made from the universe, the 6 employees with the least seniority of the 12 (from the bottom up) were designated at-risk and the 6 with the most seniority were designated not-at-risk.

AT & T–IS offered every employee in a universe—whether protected, not-at-risk, or at-risk—the voluntary separation allowance and gave them Package No. 1, which explained the voluntary separation plan in detail.

The company also provided at-risk employees Package No. 2, which advised them that they were at-risk and that they would be laid off on October 31, 1985 unless a sufficient number of voluntary separations occurred in their universe. AT & T–IS gave at-risk employees Package No. 2 and Package No. 1 at the same time to provide them as much advance notice of their situation as possible and to give them the opportunity to review their options, particularly their various financial options.

Regarding the distribution of Packages 1 and 2, the Guidelines stated:

> Employee Communication Package 1 should be distributed to all employees at your general surplus notification meeting and Employee Communication Package 2 should be discussed at a different time and on an individual basis with your at-risk employees.

Moreover, the Guidelines required the company to designate at-risk employees only after it had received responses to the voluntary package. The "Force Management Action Plan" required several weeks to elapse between the voluntary and involuntary phases of the reduction, with the involuntary phase being implemented only "if necessary" after all voluntary acceptances were received. The company required that all voluntary acceptance be postmarked by October 4, 1985. Involuntary layoffs took effect October 31, 1985.

The letter accompanying the second package refers to prior notification of the voluntary plan:

> You were previously notified that you are part of a work group in which management positions were declared sur-

plus. You were given a package at that time explaining the voluntary MIPP plan. Regrettably, now I must tell you that your position has been declared surplus and if another position cannot be found by the designated termination date you will be separated.

AT & T–IS's personnel department implemented and coordinated this process and the personnel and legal departments were required to approve each step. Moreover, the personnel department monitored the process and required each organization to provide it with specific information regarding each affected employee, including name, race, sex, date of birth, age, net credited service date, years of service, SMA treatment, specific skills, and remarks. The personnel department also required an EEO analysis regarding the layoff's statistical impact on certain protected employee groups, including women, minorities, and employees over 40 years of age. Each organization was required to explain and document any decisions that appeared to deviate from the established selection criteria.

John McCormick ("McCormick"), the company's Equal Employment Opportunity Staff Manager for the six-state Northeast Region Personnel Group observed that the reduction-in-force prompted an increase in the number of discrimination complaints, including age discrimination complaints. Morser was the only employee of the 165 employees in universes in his organization to lodge an age discrimination complaint.

*The Reduction–In–Force in Morser's Organization*

At the time of the reduction-in-force, Morser worked as a staff manager in the Division within AT & T–IS's Account and Industry Marketing Organization (the "Organization"). The Organization, headed by Dana M. Becker ("Becker"), was divided into six divisions, with Waters heading Morser's Division. Reporting to Waters were several district managers, including Chapman, who was Morser's immediate supervisor.

The reduction-in-force required Becker to reduce the Organization's workforce by 25 percent. Becker's first step involved working with her managers and the various field sales groups her Organization supported to determine which job functions were essential for the Organization to operate with a significantly reduced work force.

Becker and her managers decided to reduce or eliminate altogether AT & T–IS's trade show involvement. This resulted, among other changes, in the closing of several regional offices located throughout the United States and a reduction in the various administrative functions that supported the trade show activity. At the time of the reduction-in-force, Morser's job duties were comprised primarily of trade-show-related administrative functions. At his deposition, Morser acknowledged that the company's withdrawal from trade shows would significantly reduce his duties.

After determining which functions to retain and which functions to reduce or eliminate, Becker and her managers, in accordance with the Guidelines, grouped the Organization's employees into several universes. Morser was in the "SG5/Exhibits–New York Universe," which included the six staff managers who worked in the Division's New York office.

Once they established the universes, Becker, Waters, and Chapman selected the protected employees. The protected employees in Morser's universe included: Dorothy O'Hara ("O'Hara"), age 44, with 25 years of service; Byron Ware ("Ware"), age 45, with 20 years of service; and Rick Paulson ("Paulson"), age 42, with 15 years of service. All three declined the voluntary separation allowance and chose to remain with AT & T–IS. The protection of three of the six members of Morser's universe departed from the Guidelines' requirement that managers protect only up to 40 percent of the employees.

Waters testified at his deposition that the company protected those employees who could "shoot with both hands" and had a "variety of shots." AT & T–IS was concerned with protecting employees who could perform a variety of functions because the downsizing would reduce the work force by 25 percent and require a redistribution of duties among the remaining employees.

O'Hara, who had experience as a trade show manager and a background in clerical management, had received an SMA the previous year and was a multi-year winner of the International Exhibitors Association's "Focus" award.

Ware had transferred from Technologies to AT & T–IS's Exhibits and Promotions group almost two years before the reduction-in-force. Waters testified at his deposition that Ware's job before the reduction-in-force was "managing the equipment provision and technical support for the regional and local trade shows." Waters also testified that Ware was protected because of the technical skills he acquired from working at the Hudson Street location. Ware was knowledgeable about AT & T–IS's newest computer products and systems and had worked as a trade show manager.

Paulson, who had functioned as a trade show manager, had not received an SMA. At her deposition, Becker testified that Paulson was a:

[g]ood performer, as I recall, and I am not specifically sure if there were certain skills. Paulson was considered a reasonably good performer. And needed in the job he was in. I am not sure exactly what job he was doing.

Becker also stated that Paulson exhibited "versatility."

The designation of three protected employees in Morser's universe left three remaining employees, all of whom were designated as at-risk. They included: Jim Sheridan ("Sheridan"), age 56, with 38 years of service; Morser, age 58, with 23 years of service, and George Whitney ("Whitney"), age 38, with 16 years of service.

At his deposition, Waters testified that when they discussed Sheridan, Morser's 56 year old colleague, they noted that, although he had been doing his job for a

number of years, "it didn't appear that he had much in additional capabilities." Sheridan accepted the voluntary separation allowance and currently runs his own business.

After being notified that he was at-risk, Whitney began searching for a new job. Through a friend who lived in his neighborhood, he learned of a job as an instructor at the Corporate Education Center in Hopewell, New Jersey run by Technologies, where he now works. AT & T-IS did not place Whitney in this job.

When considering Morser, Waters testified, the managers discussed his "potential" and concluded that "his background for the future didn't appear to have much in the way of flexibility." Chapman testified that the managers identified Morser as "less able as a person to deal with people in this high speed world that required computers and all that sort of thing." In their depositions, Chapman and Waters stated that they considered Morser to be an "adequate" or "satisfactory" performer, but one whose skills were not as varied or strong as the three protected employees.

Chapman, Morser's immediate supervisor stated in his affidavit:

What I did tell Mr. Morser, on several occasions, was that other employees had been "protected" instead of him on the basis of their job functions, skill, performance, and the contribution they could make, in view of all of these things, to the future success of the organization. I did not believe—and I communicated this fact to my superiors—that Mr. Morser's skills and the particular functions he performed—were essential to the work that remained to done after the downsizing. His job duties that remained after the downsizing—which were quite limited—could be and were performed by other employees *in addition to* the other duties they performed.

Morser acknowledged at his deposition that he did not have experience as a trade show manager.

Becker testified that she and her division managers discussed Morser when they met to decide the universes. Specifically, she said:

There was discussion around Sheridan/Morser—the protected versus non-protected, that list. And that did have to do with the fact that the years of service, particularly Sheridan, by the way, was very long years of service, and, you know, why we had the people we had protected. We did talk about that in the meeting. And the reasons for protecting —obviously Dotty [O'Hara] was an SMA so that was not difficult.

There was an observation that there was age and we ought to look at that. It was years of service actually. The concern also was that Sheridan had a lot of years of service to the Company.

Each of the managers involved in the decision not to protect Morser—Becker, Waters, Chapman, and Dooley—stated at deposition or in an affidavits that Morser's age, or the age of any other employee, did not affect his at-risk status or his eventual layoff.

When Morser transferred to AT & T-IS, AT & T-IS never received his personnel file. Becker testified that managers should have contacted previous organizations to obtain the records of people who had transferred from other organizations. Waters and Chapman testified that they never reviewed Morser's or other employees' personnel files when they were assessing work performance. Morser claims he told the company his personnel files were missing.

Because Morser had been with AT & T-IS for less than a year, he was not eligible for an SMA. Morser had received a "good" rating in his last year at Technologies, but AT & T-IS does not award an SMA just for a "good" rating.

Morser declined the MIPP payment, was unsuccessful in obtaining another job, and was laid off on October 31, 1985. Upon his termination, AT & T-IS paid Morser a lump sum separation allowance of one year's salary—$55,300—and immediately commenced paying him the pension benefits available under the company's management pension plan.

After AT & T–IS discharged Morser, it distributed Morser's remaining job functions among other employees. It did not replace him with another person.

The company gave Morser's major responsibility before his discharge, coordination of transportation, to Michael Magnini, age 32. In doing so, AT & T–IS centralized all its transportation operations in Chicago, where Magnini worked. Magnini continued to perform all the other duties he had performed prior to the reduction-in-force, including serving as an on-site trade show manager, developing a new style of graphics and managing AT & T–IS's graphics inventory, and developing the computer program that was used throughout the organization to track and catalog AT & T–IS's exhibit structure inventory. Magnini had not been in Morser's universe because he was based in Chicago, not New York, and served as a "first level/SG–3" manager, not an SG–5 manager. The company assigned other of Morser's duties to Ware, O'Hara, and Paulson.

In total, 165 employees in Becker's organization were in universes. Of these, 76 were protected, 52 were not-at-risk, and 37 were at risk. 22 of the 37 at-risk employees—60 percent—were under the age of 40, while 15 were over the age of 40. Ten of the 21 employees who remained in Morser's Division after the reduction-in-force were over 40, ranging in age from 41 to 57.

The reduction-in-force had virtually no effect upon the average age in Becker's Organization. The average age of the 165 employees in universes before the downsizing was 36.76 and the average age of the 128 employees that would have remained had the company laid off all 37 at-risk employees was 36.18. The median age would have remained the same at 36.

Similarly, the downsizing did not significantly alter the average age in Morser's Division within the Organization. The average age of the 32 employees in the Division before the reduction-in-force was 39.40 compared with an average age of 39.09 of the 21 employees who remained after the downsizing.

Some of the at-risk employees with sufficient seniority remained with AT & T–IS when protected or not-at-risk employees elected the voluntary MIPP. Other at-risk employees themselves elected the voluntary MIPP. A number of the at-risk employees, ranging in age from 27 to 45, found jobs in other AT & T organizations. Ultimately, 7 of the 37 at-risk employees, including Morser, were laid off as a result of the reduction-in-force.

*The Standard for Summary Judgment*

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of proving that no genuine issue of material fact exists. *See id.* at 247–48, 106 S.Ct. at 2510; *Corselli v. Coughlin*, 842 F.2d 23 (2d Cir.1988). All doubts are resolved against the moving party, and all favorable inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1988); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (1983). The Supreme Court recently has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims...." *Celotex Corp. v. Caltrett*, 477

U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The Second Circuit has noted that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

*Legal Standards Applied in Age Discrimination Suits*

Morser has sued under ADEA, which makes it "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The standards concerning burden and order of proof in cases under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and 42 U.S.C. § 1981 apply in ADEA cases. *Pena v. Brattleboro Retreat,* 702 F.2d 322 (2d Cir.1983); *Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 80–81 (2d Cir.1983).

The order and allocation of proof in discrimination cases is well-established:

> First, the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Meiri v. Dacon,* 759 F.2d 989, 994 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (*quoting Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed. 2d 207 (1981) (*quoting McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). The

standards for summary judgment apply at each stage of this three-step analysis. *Id.* at 995.

The *prima facie* test generally applied in age discrimination cases requires the plaintiff to show that: (1) he belongs to the protected group (40 years of age or older); (2) he was qualified for his position; (3) he was discharged; and (4) his position was filled by someone younger than he or was held open for such a person. *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 n. 1 (2d Cir.1984); *Stanojev v. Ebasco Servs., Inc.,* 643 F.2d 914, 919–20 (2d Cir.1981).

■ In reduction-in-force cases, courts have recognized that, "by definition, when the employer reduces his work force he hires no one to replace the one he lets go." *Matthews v. Allis Chalmers,* 769 F.2d 1215, 1217 (7th Cir.1984). Consequently, a plaintiff discharged as part of a reduction-in-force meets the fourth element of his *prima facie* case if he establishes that some evidence exists from which a fact-finder might reasonably conclude that the employer intended to discriminate against older employees. *See, e.g., Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir. 1983); *Deutsch v. Carl Zeiss, Inc.,* 529 F.Supp. 215, 217–18 (S.D.N.Y.1981).

■ The plaintiff in an age discrimination case must show that "age was a causative or determinative factor, one that made a difference in deciding whether the plaintiff should be employed." *Geller v. Markham,* 635 F.2d 1027, 1035 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). In essence, an ADEA case hinges upon whether the plaintiff can prove that "but for" his age, and the employer's desire to discriminate on that basis, plaintiff would not have been discharged. *See, e.g., Pena v. Brattleboro Retreat,* 702 F.2d 322, 323 (2d Cir.1983).

*Conclusions of Law*

■ There is no dispute that Morser has established the first three elements of his *prima facie* case: he was 58 years old at the time of his layoff and therefore a member of the ADEA-protected age group; he

was qualified for the job that he held at the time of his layoff; and he was laid off as part of AT & T–IS's reduction-in-force. The issue here is whether Morser can establish evidence to support an inference that his age was a determining factor in his termination. Because Morser has offered no evidence from which a reasonable jury could infer age discrimination, his complaint is dismissed pursuant to Rule 56, Fed.R.Civ.P.

### Alleged Age Bias in the Overall Reduction-In-Force

Morser charges that AT & T–IS's entire reduction-in-force was "infected" with age bias. For support, he points to the simultaneous distribution of Packages 1 and 2 as evidence that the company had predetermined the involuntary terminations, to alleged age-related criteria, such as "potential" and "future potential," for protecting certain workers, to "subjective" stages in the process, such as determining universes and protecting certain employees, and to the increase in age discrimination complaints McCormick reported.

As the facts found above demonstrate, AT & T–IS sought to ensure that the massive reduction in its work force would not have a disproportionate impact on particular groups of workers, such as minorities, women, and persons over 40 years of age. Accordingly, it established procedures for monitoring the downsizing's impact on these groups. In light of AT & T–IS's sensitivity to this issue, it is not surprising that statistics establish that the layoff in Morser's Organization had no effect on the average or median age of the Organization's employees and that Morser was the only employee in the Organization to complain of age discrimination.

The fact that McCormick reported that the massive 24,000 employee reduction-in-force—the largest downsizing in the company's history—increased the number of discrimination complaints within the company also is not surprising and certainly does not support an inference that the entire process was "infected" with age bias.

The undisputed evidence establishes that AT & –IS's large scale reduction-in-force was entirely fair and reasonable. Indeed, Morser's attorney conceded at oral argument that the principal issue in this case was the company's application of the overall plan to Morser.

### Alleged Age Bias in Morser's Discharge

Morser cites certain facts to demonstrate age bias in his discharge, including the determination of Morser's six-person universe, AT & T–IS's departure from its guidelines by protecting 50 percent—three of the six—employees in Morser's universe, the company's failure to place him in another job, various comments and discussions by the people who decided not to protect Morser, these persons' assessment of Morser's performance and potential, the decision to protect Ware rather than Morser, and the reassignment of Morser's remaining functions to younger workers. None supports a finding that AT & T–IS discharged Morser because of his age.

The company determined Morser's universe according to reasonable and nondiscriminatory criteria: all those employees at a particular level (SG5 staff managers) in a particular location (New York).

Although the Guidelines suggested that managers protect up to 40 percent of the people in any given universe, Morser's superiors elected to protect three (50 percent), rather than two (33 percent) of the six employees in his universe, a fact that supports no inference of age discrimination.

The company set up extensive procedures to find discharged employees jobs in other AT & T entities and elsewhere, but failed in its attempt to place Morser. However, it also did not place the other two at-risk employees in Morser's universe, Sheridan (age 57) and Whitney (age 38), a fact that refutes any discriminatory inference.

Morser attempts to infer a desire to protect younger workers from various comments that his superiors made when assessing his performance ("potential," "his background for the future didn't appear to have much in the way of flexibility" (Waters); "less able as a person to deal with

people in this high speed world that required computers and all that sort of thing" (Chapman)). In the context of a massive reduction-in-force slashing AT & T–IS's workforce by 25 percent, these comments reflect nothing more than a concern with the immediate future—particularly the company's ability to distribute the full range of functions among the remaining employees to facilitate the company's continued operations. They do not support an inference that AT & T–IS sought to retain young employees who would remain with the company far into the future. *See, e.g., Nobler v. Beth Israel Medical Center,* 702 F.Supp. 1023, 1029 (S.D.N.Y.1988) (holding that testimony that the defendant was seeking "the best leadership ... into the next century" supported, "with difficulty," an inference of age discrimination).

Morser also infers age discrimination from Becker's deposition testimony ("There was an observation that there was age and that we ought to look at that."). However, this statement in context reveals a concern with seniority, not age. More importantly, the managers' decision to consider "age" reflected a sensitivity to the impact the determination of universes would have on older workers—the managers ultimately concluded that the designation of universes would not unfairly affect these employees.

Morser contends that the managers failed adequately to consider his past performance when determining whether to protect him because they did not review his personnel file and because his brief tenure with AT & T–IS made him ineligible for an SMA. However, the managers were familiar with Morser's performance from their own experiences in working with him. Moreover, neither of these facts supports an inference of age discrimination because the managers did not review other employees' personnel records, and Morser received the same treatment as other workers who were ineligible for SMAs.

Morser maintains that AT & T–IS's decision to protect Ware (age 45), rather than Morser, supports an inference of age discrimination. Following the reduction-in-force, Morser's universe was cut in half, from six to three staff managers. This necessitated the protection of workers capable of continuing to perform their own functions as well as those of the discharged workers. The managers' unrefuted testimony reveals that they compared the skills of Morser and Ware and concluded that Ware could take over some of Morser's functions, but that Morser could not perform all of Ware's duties. In light of this business judgment, Morser's own belief that he was qualified to fill Ware's position "carries little weight." *EEOC v. Trans World Airlines, Inc.,* 544 F.Supp. 1187, 1219 (S.D.N.Y.1982); *see also Rosengarten v. J.C. Penney Co.,* 605 F.Supp. 154, 157 (E.D.N.Y.1985) ("It is the perception of the decision-maker, and not that of the plaintiff himself, which is relevant.").

Finally, Morser charges that the redistribution of his principal duties to Magnini (age 32) indicates age discrimination. Again, however, this decision reflected a concern with functions, not discriminatory intent. AT & T–IS decided to centralize its transportation operations in Chicago, where Magnini was based, rather than New York, where Morser worked. Significantly, the company was not faced with a choice between Morser and Magnini because Ware was not in Morser's universe.

In *Dabrowski v. Warner–Lambert Co.,* 815 F.2d 1076, 1080 (6th Cir.1987), the Sixth Circuit captured the essence of the dispute at issue here:

> The picture painted by the facts in this case is not one of a company discriminating on the basis of age; it is a picture, rather, of a company retrenching in a way that required a number of employees to compete for a smaller number of positions available in the Detroit area. That [the plaintiff] was not successful in this competition is not indicative of age discrimination; it is simply indicative of the hard times faced by people of all ages in [the defendant's] facilities during this period.

*Conclusion*

On the facts and conclusions set forth above, AT & T–IS's summary judgment

motion is granted and the complaint is dismissed.

It is so ordered.