Donald W. **BRINK**, plaintiff,

v.

**UNION CARBIDE CORPORATION,**
**defendant.**

**No. 93 CIV. 2500(RO).**

United States District Court,
S.D. New York.

Feb. 18, 1999.

Wisehart & Koch, New York, New York by Arthur M. Wisehart, for Plaintiff, Donald W. Brink.

McDermott, Will & Emery, New York, New York by Joel E. Cohen, Julie Y. Chen, Nancy Solomon Weiss, for Defendant, Union Carbide Corporation.

## OPINION AND ORDER

OWEN, District Judge.

Plaintiff Donald W. Brink, terminated by his employer Union Carbide Corporation, alleges (1) employment discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), the New York State Human Rights Law, N.Y. Exec. Law § 296(3–a)(a), and the Connecticut Human Rights and Opportunities Act, Conn. Gen.Stat. § 46a–60(a)(1); (2) a violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1140; and (3) breach of contract for employment during worklife expectancy. Carbide disputes this, asserting that Brink was an at-will employee whose termination occurred during a major, prolonged down-sizing and was arrived at by ranking the entire 15–member unit on the basis of abilities without reference to age. Carbide moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

On November 22, 1976, Carbide hired Brink, then 43 years old, to work at Carbide's New York City office as a Business Intelligence Analyst in its Chemicals & Plastics division. Brink and Carbide signed a Memorandum of Employee's Agreement, which stated "THIS AGREEMENT does not, of course, bind either party to a specific period of employment." Brink was a participant in Carbide's pension plan, with pension benefits flowing from a combination of the employee's salary, years of service, and age.

Brink was promoted to Senior Project Administrator in 1978. In 1979, he was transferred from the Chemicals & Plastics division to an overall corporate level and was promoted to Staff Assistant for Investor Relations. In 1981, Brink was transferred to the corporate Financial Planning & Analysis group ("FPA"), located at Carbide's Danbury, Connecticut headquarters and Brink moved his home to Connecticut. There, he held the position of Senior Analyst.

In 1985, Carbide began a lengthy restructuring in which it sold or spun off numerous divisions, such as home, automotive and battery. This greatly reduced its need for financial analysts. Controlling interests in other divisions, such as Carbon Products, were also sold. In 1985, Brink was offered a voluntary separation program, which he refused. By 1990, only two divisions remained: Chemicals & Plastics and Industrial Gases (known as Linde). At that point, corporate FPA was consolidated with the FPA from the Chemicals & Plastics division, resulting in one FPA group. Brink, who was approximate-

ly 57 years old at the time, was retained in the consolidated FPA, and his primary responsibilities became competitive analysis and external reporting. His competitive analysis work, which occupied slightly more than half of his time, included comparing Carbide and its individual businesses "with similar businesses that are in the chemical industries and the oil industry." In 1991, plaintiff's competitive analysis work involved preparation of two different reports, an executive compensation report and a competitive analysis report for Carbide's remaining two businesses. In preparing these reports, Brink was assisted by two other FPA employees, Deanna Gayer and Joe Agresta. Plaintiff's external reporting work, which occupied slightly less than half of his time, included assisting in the preparation of the corporation's annual report, SEC filings and other documents necessary for stockholder disclosure. As the only FPA employee working on external reporting, plaintiff's role involved assisting other departments, such as Carbide's communications law, and corporate accounting departments.

In early 1992, Irving Agard was the director of FPA. Below Agard were four managers, one of whom, Richard Fronapfel, was Brink's immediate supervisor. FPA's hierarchy was as follows:

Irving Agard
Director

| Richard Fronapfel<br>Manager | Ronald Oliveri<br>Manager | Robert Morales<br>Manager | Paul Davis<br>Assistant Dir. |
|---|---|---|---|
| Donald Brink (plaintiff)<br>Analyst | Henry Vega<br>Analyst | Cindy Chen<br>Analyst | Deanna Gayer<br>Financial Assoc. |
| Joseph Agresta<br>Analyst | Lori Davlos<br>Analyst | Warren Baudendistel<br>Analyst | |
| | Marilyn Posavetz<br>Analyst | Ralph Racey<br>Analyst | |

The most recent addition to FPA was Lori Davlos, who had been transferred from Carbide's West Virginia office in January of 1992 to do cash-flow analysis.

In 1991, Carbide announced plans to further downsize by spinning off the Industrial Gases division. This would leave it with only one division, Chemicals & Plastic. That announcement, along with internal talk about a $250 million cost-reduction program, led Agard to realize that the size of his department would soon need to be reduced. Accordingly, in early 1992, he set up a plan to have his FPA staff members ranked by their managers.[1] This was done on a scale of one to five (with one being the lowest and five being the highest)[2] in six categories: ability, ef-

1. Initially, each of the managers in FPA was asked to rate the employees who reported to him. Thus, Fronapfel gave plaintiff his initial rating. Next, Fronapfel, Oliveri, and Morales met to discuss the staff members and the ratings they had received. At that point, each manager rated those staff members he had not previously rated, resulting in a total of three ratings for each staff member. Finally, the ratings for each staff member were averaged, yielding a single ranking of FPA's staff members.

Paul Davis, whose position in FPA was somewhat different than that of the other managers, was not asked to participate in the ranking process; thus, Deanna Gayer was neither rated nor ranked.

2. This ranking system was different from Union Carbide's usual numerical performance

fectiveness, versatility, value to continuing business, uniqueness, and reassignment potential. Neither age nor seniority were categories. Their ratings in those categories were then totalled. The final ranking was as follows:

| Bank | Name | Rating |
|---|---|---|
| 1 | Lori Davlos | 25.3 |
| 2 | Henry Vega | 24.3 |
| 3 | Ralph Racey | 20.7 |
| 4(tie) | Donald Brink (plaintiff)) | 20.3 |
| 4(tie) | Joseph Agresta | 20.3 |
| 6 | Marilyn Posavetz | 18.7 |
| 7 | Warren Baudendistel | 18.0 |
| 8 | Cindy Chen | 17.3[3] |

With the ranking completed, Agard did not immediately make any decisions regarding who would be terminated. He first contacted the division controllers and other staff groups to inquire whether they might have openings for any of his staff. Agard had some difficulty here because a number of his FPA analysts (including Brink) were at a higher grade level (14) than analyst vacancies or needs existing in other departments. For instance, Agard described in his deposition the following discussion with Nick Thold in the Investor Relations department:

Nick Thold indicated to me that he had an employee working for him who was a grade 10. The employee wanted to retire and he felt he had to fill the job. He wondered if I had any candidates who were available for that job. I gave him the list of all the candidates that I had which was, in effect, I offered up everybody in my organization and said,

you know, are any of these people acceptable to you. He said Don Brink used to work in my organization, I know Don, and he said I would like to talk to Cindy Chen. He talked to her and said she would be perfect for the job, and I said but Don did the job before. He said this is a grade 10 job. He said I think I can add enough to that job to make it a grade 12 but I can never justify a grade 14 on the job.

Thus, Chen was placed with Investor Relations. Similarly, Marilyn Posavetz was placed as a financial analyst with the Industrial Gases division; a manager in that division had "indicated that the highest grade experience they could afford for the job was a grade 12 person". A third FPA staff member, Warren Baudendistel, who did have a Grade 14, was placed with another controller who chose him specifically. This left Agard with five FPA staffers—Davlos, Vega, Racey, Brink, and Agresta, in order of their ranking—along with Deanna Gayer. The expected division-wide reduction in force came to pass in May 1992 as part of a fifty percent cost reduction target for the controller's organization. Agard decided to keep the two top-rated analysts—Davlos and Vega—and to "surplus" Brink, Agresta, and Racey. Gayer and her manager, Davis, were also eliminated. On June 22, 1992, Brink was informed that he was to be terminated, effective August 31. In total, Mr. Agard reduced his staff from 15 to 5 including terminating a manager and an assistant

evaluation in which 1 is the highest rating, 4 the lowest, and 5 the rating reserved for employees who are too new to evaluate. Brink's ratings over the years were 2s and 3s.

**3.** The ages, employment grades, salaries for years of service of those rated, did not appear on the ranking chart. This information was provided to the Court calculated as of the date plaintiff was informed of his termination, June 22, 1992.

| Rank | Name | Rating | Age | Emp.Grade | Salary | Years of Service |
|---|---|---|---|---|---|---|
| 1 | Lori Davlos | 25.3 | 36 | 12 | 61,980 | 14 years |
| 2 | Henry Vega | 24.3 | 48 | 14 | 79,320 | 15 years |
| 3 | Ralph Racey | 20.7 | 49 | 14 | 83,280 | 25 years |
| 4(tie) | Donald Brink (plaintiff) | 20.3 | 59 | 14 | 85,440 | 15 years |
| 4(tie) | Joseph Agresta | 20.3 | 63 | 15 | 93,360 | 30 years |
| 6 | Marilyn Posavetz | 18.7 | 39 | 12 | 66,360 | 16 years |
| 7 | Warren Baudendistel | 18.0 | 51 | 14 | 79,020 | 33 years |
| 8 | Cindy Chen | 17.3 | 51 | 12 | 70,320 | 15 years |

director, leaving the following people of various ages:

I. Agard (45)

R. Fronapfel (53) H. Vega (48) L. Davlos (36) R. Morales (45) This left Carbide, which had had 117,000 employees in 1985, with but 16,000 in mid–1992.[4]

4. Over time thereafter, the personnel of FPA, along with their responsibilities continued to be adjusted. In September of 1992, Robert Morales, aged 45, one of the FPA managers, transferred to another department, and Michael Mazuroski, age 46, was brought in to replace him. Mazuroski, a grade level 16 employee, had been a manager in the FPA in Carbide's Specialty Chemicals division. Ronald Oliveri was surplussed, with Mazuroski and Davlos taking over Oliveri's responsibilities. At the beginning of 1994, Davlos was transferred to another division, and Dominic Nocturne, a grade level 16 employee with a PhD, came in, took over her cash flow work and, with his greater quantitative mathematical skills, took on a certain project for which Davlos' background had not equally equipped her. (This is dealt with in detail *hereafter*, p. 10). Under the reorganized structure, the duties formerly handled by Brink were cut back substantially and distributed to a number of people in different departments. Competitive analysis on the corporate level was handled by Gary Justiano, a junior auditor in the Internal Audit department, and the analyses were less detailed than when Brink generated them. Quarterly reports to management were authored by Vega, still in FPA, with contributions from Nocturne and Mazuroski. Those three also handled the stockholders' reports, to which a substantially decreased amount of man hours was devoted, as compared to when Brink was responsible for them.

Brink's contrary contention that the work he was doing in fact increased after his termination, for which he refers the Court to his deposition at pp. 230–43, is without support. By contrast, the deposition testimony of Agard, pp. 283–400, 295–8, details the considerable reduction of time spent on areas Brink formerly worked on, for example:

When Don Brink was working on competitive analysis, Don Brink was spending, my guess would be 50, 60 percent of his time on competitive analysis. Deanna Gayer was spending the bulk, 80 or 90 percent of her time, on competitive analysis, and Joe Agresta was probably spending 5 per-

Notwithstanding the foregoing rather ordinary sequence of events in a lengthy major corporate down-sizing and restructuring, Brink contends that he has stated a prima facie case of age discrimination in his termination.[5] He argues that three alleged ultimate fact contentions cre-

cent or something like that supporting them.

\* \* \* \* \* \*

Now we do four pages of analysis return on equity, return on capital, for the corporation, return on capital for C & P and operating profit for C & P and that is done twice year. It's done in the middle of the year and end of the year and that is done by a gentleman named Gary Justiano down in audits. He will probably spend a couple of weeks doing that at the end of the year which is the more complicated one, and my guess is he will probably do the one mid year or for the results as of mid year in a week, week and a half.

(Agard pp. 295–6).

This is confirmed by Fronapfel who had been Brink's immediate supervisor:

Some of what Don was doing was transferred and some was eliminated. (Deposition pp. 42–3).

5. After this motion was first fully submitted before me, Carbide moved and I struck substantial portions of Brink's affidavit because they contained conclusory assertions, hearsay statements and legal arguments. The court also struck affidavits and portions of affidavits of others. (See Court's Memorandum and Order of Nov. 20, 1997, 41 F.Supp.2d. 402.) After the ruling Brink sought to submit further papers which was denied. Brink's reason, according to his Memorandum at p. 4, was:

"... to make available those factual statements of his initial affidavit sworn to May 24, 1996, by excising therefrom those portions that the Court found to be objectionable as conclusory or argumentative in its Memorandum and Order dated November 18, 1997.

Also incorporated as part of the Brink supplemental affidavit are portions of depositions taken or Union Carbide documents identified in depositions that would otherwise be affected by the Court's Memorandum and Order dated November 18, 1997, despite the independent grounds for their admissibility pursuant to Fed.R.Civ.P. 56(e)."

This being Brink's stated basis, it was unnecessary to receive further papers, since 1) the

ate material issues supporting the conclusion of discrimination against him by Carbide because of his age. The first is that when the FPA unit was reduced in size, Director Agard found slots elsewhere in Carbide for three younger employees (two aged 51 and one 39), but not for him. Brink's second factual assertion is that the ranking procedure utilized was pretextual and, he contends, "an exercise in deliberate deception."[6] The third ultimate factual assertion, which is Brink's main contention, is his assertion that the transfer into FPA of Lori Davlos, a younger employee of unknown skills and little competence, to do work he could have done,[7] with a lower grade and salary, (and her retention at and after the time of his termination) is evidence that age discrimination was the mo-. tivating factor behind Brink's termination and not the legitimate restructuring which Carbide claims.[8]

Turning to Brink's first claim [notwithstanding all of his many record references at the top of page 12 of his memorandum], he proffers no evidence to create an issue as to the bona fides of Agard's efforts to find slots elsewhere for everyone, including Brink, whom Agard felt he had to

surplus in the restructuring,[9] nor does Brink dispute that the reason Agard was able to find slots for three of his staff was because they were at lower grades and salary levels. When a corporation does a massive restructuring, some employees will necessarily be surplussed or transferred but this fact "is not indicative of age discrimination." *Morser v. AT & T Info. Systems*, 703 F.Supp. 1072, 1083 (S.D.N.Y. 1989) (quoting *Dabrowski v. Warner–Lambert Co.*, 815 F.2d 1076, 1080 (6th Cir. 1987)).

Brink next asserts an issue of material fact as to age discrimination from Agard's ranking procedure and claims "pretext" and "deliberate deception." He asserts no facts, however, to support a claim that the ranking process Agard utilized was not fairly and objectively done. At the core of Brink's attack is a repetitious denigration of the skills and background of Lori Davlos, who had been transferred from Carbide's West Virginia office, into the FPA unit shortly before its members were rated, she was retained and not transferred to another unit until some two years later, a year and a half after Brink was sur-

---

excising had already been done to the original affidavit, and 2) the depositions and Carbide documents were already before me pursuant to the express language of F.R.C.P. 56(C). Brink's last-minute proffer of an affidavit from an industrial psychologist, purportedly expert as to age stereotypes in the work place, was rejected.

6. Brink Memo p. 10.

7. Brink, at numerous places, states his own belief that, for example, he "was much better qualified" (Aff.¶14) or "I easily could have performed these assignments given to" certain others (Aff.¶52). Such self-serving views of one's own merits cannot establish pretext and are not considered by the Court. *See Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir.1984); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

8. Brink is in error that Davlos' skills were unknown when she came to FPA, for the record is uncontradicted that she came with developed skills in cash-flow analysis in Car-

bide's West Virginia office and as Fronapfel testified,

> I was unfamiliar or I did not have direct experience with her. I don't know to what extent any of us did. *We all knew her by reputation.* (Emphasis supplied).

Agard's overall laudatory view of her performance at FPA in his deposition (see Appendix A), is in no way undercut, as Brink suggests, by Agard's handwritten memo regarding the forced rankings where wrote "Lori Davlos may be too high", for Agard in the same memo writes, "If I were forced to rank all my employees (no matter what grade level)", he then numbered his managers Morales and Fronapfel "1" and "2", somebody named Rice "3", and ranked Davlos next at "4" and Brink "9" out of 15. This cannot be the basis of a claim that Agard did not think highly of Davlos, which he did and expressed within a short time after her arrival.

9. Fronapfel's testimony confirms this. (Deposition p. 13).

> Irv [Agard] attempted to fill, to place all of the people, and he was successful in placing three people.

plussed. Brink's numerous assertions as to her must be quoted in order to be addressed. He asserts that Davlos had been added to the FPA staff "... under the guise of performing the specialized task of cash flow analysis[,]"[10] notwithstanding "deficient skills"[11] and "deficiencies in [her] qualifications and performance",[12] and "knowledge of weaknesses in her qualification..."[13] and that despite "little relevant experience,"[14] she was "transferred ... [into] FPA and then transferred [out] because ... of deficiencies in her mathematical and computation abilities"[15]; and that Agard "was forced to rid FPA of her ..."[16] and that she "had to be eliminated ... and replaced because ... 'she did not have the strong mathematical quantitive kind of skills'[[17]] required by FP & A."[18]

However, upon close examination of the depositions and other uncontradicted evidence in the case, it is clear that the attack on Ms. Davlos is completely contrary to the record, and includes misleading editing of one sentence of deposition testimony by Agard. (See fn 17 supra). The record shows that Agard brought her in because of her known, experienced background; that she was a fine, productive employee; she brought several major tasks of considerable value to the company into line, and performed them in much less time than theretofore required by those before her. This is all laid out in Agard's testimony which is set forth hereafter in Appendix A. Davlos had come from Carbide's West Virginia office to do cash flow reporting analysis—a field in which Brink did no work—and her reputation had preceded her.[19] Fronapfel testified she was very much needed.[20] That work, as to which she had substantial background, (See Appendix A,

10. Brink Memo p. 10.

11. Brink Aff. p. 7.

12. Brink. Aff. pp. 7, 16.

13. Brink Aff. p. 6.

14. Brink Aff. p. 8.

15. Brink Aff. p. 16.

16. Brink R. 56.1 Statement of Disputed Material Facts, p. 9.

17. [Footnote by the Court]

This inner quote is from the deposition testimony of Davlos' director Agard and has been so edited in the Brink Memorandum of Law as to be wholly out of context with no applicability to the issues before the Court. The entire quotation showing the different subject of Agard's observation at that point is set forth verbatim hereafter at Appendix B p. 23. In fact, Agard was referring to one special project to develop metrics and targets (more than a year and-a-half after Brink's termination) which Don Nocturne was going to undertake, among others, for which project Davlos did not have the strong mathematical skills that Nocturne had. Agard's testimony reads:

Q. Are you saying that Lori didn't have the requisite qualifications *for that work?* [Emphasis supplied].

A. Lori's qualifications—she does not have the strong mathematical quantitative kind of skills *that he has.* [Emphasis supplied]. Her skills are much more related to the actual financial reporting of operations within Union Carbide's—reporting of Carbide's results, analysis of existing results. This is much more of a forward look—I would say the activity that Don is doing is much more of a planning activity.

Brink, endeavoring to support his claim that Davlos was weak and deficient and had to be eliminated, asserts in his Memorandum (p. 18) that this was because:

" 'she did not have the strong mathematical quantitative kind of skills' *required by FP & A,"* but to achieve the inaccurate conclusion, the last three words are a substitution by Brink for the words "for that work," Nocturne's special project, which words were in the question Agard was asked.

18. Brink Memo p. 11.

19. See fn. 8 supra.

20. Q. Was Davlos brought up to fill a vacancy?

A. She was brought up because we believed we needed assistance in cash flow, cash flow has been—had been a problem for the department for some time. We didn't feel that we had a good grasp of the analysis of the cash flows, and we brought somebody to help Ralph Racey who was doing that work.

p. 20), had, prior to her arrival at FPA, been done by two members of FPA, Ralph Racey and John Nelson. Nelson had left, and upon Davlos' arrival, she and Racey worked full-time on cash flow. Then, after the ranking process, she being higher than Racey, she took over the entire responsibility for cash flow and Racey was surplussed. As time went on, she got the cash flow task down to where she was only spending 30 to 40 percent of her time on it. She was then put on project analysis for the remaining 60 to 70 percent of her time. There, according to the uncontradicted testimony of Agard, she did a "very thorough" analysis, finding various discrepancies and making recommendations on how to correctly do employee plans and expenses so that plants and divisions were uniformly being charged with what it was really costing each one. She was also spending "a lot of time working on the construction program and the investment program" where she was concerned about inventory for each business, each of which had theretofore calculated inventory for analytical purposes in different manners. She corrected this and got everybody using the same approach and Agard deemed her the "main player" in the consolidation of the annual business plan and strategic plan, and financial forecasters.

In the construction program, Davlos provided the data to Agard, who then discussed it with Carbide's president, who then worked it into a presentation to the board of directors. Having gotten all this in place, and having gotten the cash flow work down to 30 to 40 percent of her time, Davlos in 1994, a year and a half after Brink's departure, turned the cash flow work over to Dominic Nocturne. Here, it was anticipated that when *he* got over his learning curve, he would spend no more than 30 to 40 percent of his time on cash flow analysis and would, in addition, do specific project work involving looking at strategic performance plans and metric and targets fields of the corporation and then individual businesses. For this specific project Davlos did not have the requisite qualifications. Davlos was then transferred to the chemicals division.

The foregoing completely undercuts Brink's attempted denigration of Davlos' skills, and with that gone, Brink's attack on the forced rating fails,[21] as does his attack on FPA bringing Davlos in to do cash flow and then subsequent important work.[22]

Summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Whether a fact is material is determined by reference to the substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden is on the moving party to demonstrate that there are no fact issues to be resolved. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must then come for-

(Deposition pp. 19–20).

21. Brink's manager Fronapfel's statement to Brink's wife and then to him a year after his termination that his termination was "unfair", which was made in the course of efforts to head off litigation, is a certainly human statement in the context, but is no evidence of age discrimination. Nor does it create an issue of fact as to the bona fides of the ranking process described earlier, pp. 3–4 or of Agard's good fair effort to place Brink else-

where in Carbide as to which Fronapfel testified:

Irv [Agard] attempted to fill, to place all of the people, and he was successful in placing three people.

22. Agard testified that even if Davlos had not come, he would *not* have put Brink on cash flow, but would have kept Racey who was already doing that work, though ranking lower than Davlos but higher than Brink, who had not done cash flow before.

ward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *see also Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (nonmoving party must base its showing on some evidence other than mere pleadings). Summary judgment will not be barred when the nonmoving party's evidence is "merely colorable" or "not significantly probative". *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

I turn first to Brink's claim under the Age Discrimination in Employment Act ("ADEA"), the New York Human Rights Law, and the Connecticut Human Rights and Opportunities Act.[23] All three are assessed under the same analytical framework applicable to Title VII cases that is set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and subsequent Supreme Court cases addressing the *McDonnell Douglas* test. *See Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir.1994) (ADEA); *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1158 (2d Cir.1993) (age discrimination claim under New York Human Rights Law is governed by same standards as ADEA claim); *Levy v. Comm'n on Human Rights and Opportunities*, 35 Conn.App. 474, 646 A.2d 893, 896 (1994), *aff'd* 236 Conn. 96, 671 A.2d 349 (1996) (Connecticut antidiscrimination statute adjudicated according to federal employment discrimination law).

While at the first stage, to make out a prima facie case of age discrimination, a plaintiff need only show that (1) he is a member of a protected age group, (2) he was qualified for the position he held, (3) he was discharged, and (4) the discharge took place under circumstances giving rise to the inference that age was a factor. *See, e.g., Woroski*, 31 F.3d at 108, and at that first stage, plaintiff's burden is a *de minimis* one. However, as catalogued in *Fisher v. Vassar College*, 114 F.3d 1332 (2d Cir.1997) (en banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 1341, 140 L.Ed.2d 501 (1998), a plaintiff's burden at the present advanced stage of this case is no longer *de minimis.*

> The burden-shifting presumption excuses the plaintiff at [the first] stage from showing that discrimination was present and caused the adverse employment action plaintiff suffered. If the plaintiff submits evidence of the minimal elements of the special discrimination prima facie case ... [,] the remaining elements (discrimination and causation) are presumed at this stage of the litigation, and defendant must take up the burden of going forward.

> *But ... the presumption disappears once the employer has proffered a reason.* When the presumption drops away, plaintiff's burden is enlarged to include every element of the claim. Discrimination and cause are no longer presumed. To sustain the burden of putting forth a case that can support a verdict in his favor, *plaintiff must then (unlike the prima facie stage) point to*

---

**23.** The ADEA provides: "It shall be unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...". 29 U.S.C.A. § 623(a)(1) (West 1985). The New York State Human Rights Law provides:

> It shall be an unlawful discriminatory practice [f]or an employer or licensing agency, to refuse to hire or employ or license or to bar or to terminate from employment an individual eighteen years of age or older, or to discriminate against such individual in promotion, compensation or in terms, con-

ditions or privileges of employment, because of such individual's age.

N.Y. Exec. Law § 296(3–a)(a) (McKinney 1993). The Connecticut Human Rights and Opportunities Act provides:

> It shall be a discriminatory practice in violation of this section [f]or an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or terms, conditions or privileges of employment because of the individual's ... age ....

Conn. Gen.Stat. § 46a–60(a)(1) (1998).

*sufficient evidence to reasonably support a finding that he was harmed by the employer's illegal discrimination.* *Fisher,* 114 F.3d at 1337 (emphasis supplied). Thus, here on this motion for summary judgment where Carbide *has* proffered and evidentiarily supported a legitimate non-discriminatory reason for Brink's termination, *Woroski,* supra at 108–9, states:

> In an employment discrimination case, to defeat a defendant's properly supported motion for summary judgment, a plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief and (2) more likely than not the employee's age was the real reason for the discharge.

■ Viewed against the foregoing, Brink's claim does not survive because Carbide has offered and supported a legitimate, non-discriminatory reason for his termination, and Brink makes no showing that this explanation is pretextual or that his age was more likely than not the real reason.

What plaintiff essentially asserts as probative of pretext are (1) the transfer into FPA, and retention and eventual transfer of the younger Lori Davlos;[24] and (2) Fronapfel's statement to Brink that the termination was "unfair";[25] (3) Agard's comment about Davlos' rating;[26] and (4) general comments such as that attributed as hearsay to a David McClure, made prior to McClure's leaving Carbide two years before Brink's termination that (while Brink could not remember the exact words) it was McClure's "personal observation"[27] that Carbide was motivated to replace executives 55 and older with younger personnel.[28] This type of unspecific attribution to a non-decision-maker vis-a-vis Brink at least two years earlier has been rejected in such cases as *Palucki v. Sears, Roebuck & Co.,* 687 F.Supp. 388, 391 (N.D.Ill.1988), aff'd. 879 F.2d 1568 (7th Cir.1989), where the court stated:

> And the testimony of fellow Sears' employees that they "felt" that Sears had some sort of master plan to discharge older employees, in the absence of statistical or anecdotal evidence supporting it, reads as unusable as conjecture and in addition fails to connect to Palucki as one illustrative case. Even if we were to give credence to the beliefs of these co-employees, like opinions their beliefs still stand as unusable because they fail to corroborate some fact. For example, there is no admissible evidence showing that plaintiff was targeted for discharge because of age to which these opinions could attach as corroboration.

All of these contentions have been examined and I conclude that they do not individually or collectively raise a fact issue as to anything material to this case. On the undisputed record, Carbide was in an extensive down-sizing, and Davlos, though younger, was a generally recognized valuable employee who ranked higher, and was kept. See, *Viola v. Philips Medical Systems,* 42 F.3d 712, 717 (2nd Cir.1994).

■ Brink next claims that Carbide's failure to promote him was similarly motivated by age discrimination. In general,

---

**24.** But see generally pp. 412–13 supra, and *Viola v. Philips Medical Systems,* 42 F.3d 712, 717 (2d Cir.1994).

**25.** See fn 21 supra.

**26.** See fn 8, supra.

**27.** Brink depo. p. 149.

**28.** Even less so do other matters in this area urged by Brink rise to the creation of issues of fact, such as: "grade creep" and "maturity curves" causing concern to company managers (Brink aff. ¶¶ 97–9) giving rise to a "pervasive ageist managerial attitude by supervising personnel, "...." (Memorandum p. 15), but not focusable on his termination".

Lastly, the lack of issue-creating value to Dr. S. Ramanujam's chart has already been dealt with in the Court's Memorandum of Nov. 20, 1997, 1997 WL 727496 at fn. 9.

he claims that, in retaliation for his refusal to accept the voluntary severance program that he was offered in 1985, he was never promoted after that point. Specifically, he claims that he was not promoted to the position of manager that opened up in FPA when Morales transferred to another department. However, on the undisputed record, Brink's contention fails as a matter of law, because Brink never applied for a promotion. Therefore, he cannot be said to have suffered an adverse employment action. See *Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir.1998), where the Court noted that in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207.:

> in establishing a prima facie case the plaintiff must show that 'she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.'

Accordingly, the Second Circuit observed in *Brown*:

> Moreover, we believe if generally requesting a promotion in an annual review were sufficient to establish a prima facie case, employers would be unfairly burdened in their promotion efforts. Rather than simply considering individuals who have specifically applied for a promotion, an employer would additionally have to keep track of all employees who have generally expressed an interest in promotion and consider each of them for any opening for which they are qualified but did not specifically apply.

Id. at 710. Thus the *Brown* court concluded:

> We find, therefore, no reason to relieve Brown of meeting the de minimis pleading requirement in a Title VII ... discrimination case of delineating a position or positions to which she applied and was rejected.

Id. at 712.

Thus, while Brink contends that his superiors were aware of his interest in being promoted, that is insufficient. With respect to the specific claim that Carbide failed to promote Brink to the manager's position vacated by Morales, Brink does not claim that he took any action at all to be promoted, and thus has failed to present *"evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion"*. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (emphasis in original) (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

Accordingly, I conclude on undisputed facts that Brink has proffered no material issue of fact that his termination or Carbide's failure to promote him were occasioned by age discrimination. Brink's claims under the ADEA, the New York Human Rights Law, and the Connecticut Human Rights and Opportunities Act are therefore dismissed.

I turn next to Brink's ERISA claim. Section 510 of ERISA provides, in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ....

29 U.S.C. § 1140.

To prevail in a claim under § 510 of ERISA, a plaintiff must show that his employer had the specific intent to engage in conduct prohibited by that section; if loss of benefits was merely a consequence of, as opposed to a motivating factor behind, the termination, then plaintiff's claim will fail. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988). And see *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997) the court stated:

Where an employee's ERISA claim is based only on a claim that the employee has been deprived of the opportunity to accrue additional benefits through more years of employment, a prima facie case requires some additional evidence suggesting that pension interference might have been a motivating factor.

There is no evidence whatever that there was any intent on Agard's or any other decision-maker's part 1) to deprive him of benefits, or even 2) that any decision-maker knew where Brink stood vis-a-vis retirement benefits, then, or in the future. *See, Dister*, 859 F.2d at 1111, where the court stated:

No ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment. . . . Plaintiff is required to prove more than the single fact that his termination precluded him from vesting into the 75/80 Plan; he must demonstrate Continental's unlawful purpose in firing him.

There is, therefore, no genuine issue of material fact in this regard, Carbide's motion for summary judgment is granted.

 I turn finally to Brink's breach-of-contract claim, which both parties agree is governed by Connecticut law. Brink claims a contract existed under which he could stay with Carbide during his work-life expectancy, until he chose to retire, if his work performance was satisfactory. Amended Complaint ¶ 132. As observed earlier, within a month of his hiring, as discussed above, plaintiff signed an agreement which explicitly stated "THIS AGREEMENT does not, of course, bind either party to a specific period of employment." Under Connecticut law, employment for an indefinite term is deemed to be at-will and thus terminable at any time by either party. *See Somers v. Cooley Chevrolet Co.*, 146 Conn. 627, 153 A.2d 426, 428 (1959).

Recent Connecticut case law appears to provide three theories on which a plaintiff may be able to avoid the result in appropriate cases: 1) proof that what appears to be an at-will employment contract is not actually terminable at will because of contract terms which can be implied from the dealings between the parties, 2) an action for breach of an implied covenant of good faith and fair dealing found in the employment contract, even if at-will, and 3) an action in tort for wrongful discharge in violation of an important public policy.

*Kelsey v. Sheraton Corp.*, 662 F.Supp. 10, 13 (D.Conn.1986) (citations omitted). Brink attempts to invoke the exceptions.

To avoid summary judgment on the ground of implied contract, Brink must show that there is a genuine issue as to whether Carbide had " 'agreed, either by word or action or conduct, to undertake some form of actual contract commitment' to him under which he could not be terminated without just cause." *Coelho v. Posi–Seal Int'l*, 208 Conn. 106, 544 A.2d 170, 173 (1988) (quoting *D'Ulisse–Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 202 Conn. 206, 520 A.2d 217, 220 n. 2 (1987)). *See also Manning v. Cigna Corp.*, 807 F.Supp. 889, 895 (D.Conn.1991) (implied contract enforceable under doctrine of promissory estoppel). While determining the intent of the parties often raises factual issues, *see Coelho*, 544 A.2d at 174, the undisputed facts in the instant case reveal insufficient grounds for a jury to find that Carbide had any implied contractual obligations. In *Lightfoot v. Union Carbide Corp.*, No. 92 Civ. 6411, 1994 WL 184670.(S.D.N.Y. May 12, 1994), *aff'd* 110 F.3d 898 (2d Cir.1997), a case with facts almost identical to the instant case (including identical language in the Memorandum of Employee's Agreement and a 1980 relocation from New York City to Danbury), the district court granted summary judgment in defendant's favor on plaintiff's breach-of-contract claim.

In this case plaintiff does not point to any clear and definite promise which was made to him by Carbide. The lack of a clear and definite promise of lifetime employment combined with the two

Memorandums of Employee's Agreement which plaintiff signed support the conclusion that plaintiff's employment was terminable at will.

*Lightfoot* at *7.

■ The same is true here. While Brink in his affidavit *on this motion* asserts that at the time of his relocation to Connecticut, "representations were made to me of secure employment for the balance of my work life,"[29] in his earlier deposition at p. 218, he testified that there were no such representations made by anyone.[30] The law is well established that a party may not raise an issue of fact in an affidavit on a motion for summary judgment that is contrary to prior sworn testimony. *Trans–Orient v. Star Trading,* 925 F.2d 566, 572 (2d Cir.1991). Because there is no genuine issue as to Brink being, at all times, an at-will employee, his breach-of-contract claim fails as well.

Given the foregoing, Carbide's motion for summary judgment is granted as to all of plaintiff's claims: employment discrimination under the ADEA, the New York State Human Rights Law, the Connecticut Human Rights and Opportunities Act; the ERISA claim; and breach of contract. Accordingly, plaintiff's action is dismissed.[31]

So Ordered.

29. Brink Aff. at ¶ 129.

30. Q. Take a look at Paragraph 93.
Could you tell me what discussions you had with officials of Union carbide concerning the relocation from New York City to Danbury?
A. There was a form given to me when I transferred to Connecticut which said that you should ask your manager about the continued opportunities for employment at that location.
Q. Meaning Danbury?
A. Yes.
And the person to whom I spoke was David McClure. •
Q. What did he tell you if you recall?
A. That there was continuing need for my skills in the corporation in the Danbury location, and he didn't see any reason why I could not continue to make progress in my career. I believe that was the extent of the conversation.
Q. Approximately what year was that?
A. November 1981.
Q. Did you have any other discussions with any management officials of Union Carbide concerning your relocation to Connecticut when the company moved its corporate headquarters there?
A. No.

31. Given the above, I need but observe that Brink's New York Human Rights Law claim fails for lack of jurisdiction since, in 1992 he was a Connecticut resident and the alleged discrimination took place there. *Iwankow v. Mobil Corporation,* 150 A.D.2d 272, 541 N.Y.S.2d 428 (1st Dept.1989), 150 A.D.2d 272, 541 N.Y.S.2d 428.

*Appendix A*

*Examination Before Trial of Irving Agard,* pp. 47–56.

A. [W]hen Lori first took over responsibility for cash flow reporting analysis, ... [she] had total responsibility, was probably mid–1992, she was spending one hundred percent of her time doing that. It's very complex area and had been very confusing to senior management for a long time.

\* \* \* \* \* \*

[The following 10 lines are brought forward from the end of this quoted area to keep chronology.]

Q. Now, with regard to the cash flow analysis that she took over when she came with your group, who was doing that before?

A. When she came with the group, if you go back to the organization chart I drew for you, 12/31/90, it was 1990, you will see that I showed a Ralph Racey and working for Ralph Racey was John Nelson. The two of them were doing the cash flow for the corporation. When Lori came to our group, she—John Nelson had left our group and she worked with Ralph Racey full-time on cash flow. Then when we shrunk the size of our group down to a much smaller level, at the same time that we shrunk the corporation down to a much

smaller level, then Lori took over the entire responsibility for cash flow and Ralph Racey was surplused.

Q. So, she was working cash flow prior to the time that the surplussing took place?

\* \* \* \* \* \*

A. During her tenure in that job, she has greatly simplified and clarified that area so that the amount of time that she was spending at the end of her tenure in the job was down to probably in the range of 30 to 40 percent of her time.

Q. With respect to Lori, after she had gotten over the learning curve phase, what was she doing with the remaining 60 to 70 percent of her time?

A. She was, basically, doing project analysis. The most recent example is that there was a real discrepancy in the way employee plans, expenses was being, one, taken to the divisions, and taken to the plants, and she went back and did a fairly thorough analysis, a very thorough analysis on how the employee plan was being handled in the different divisions and plants and found early—discrepancies and made recommendations on how to correctly do employee plans and expenses, so that plants and divisions were being charged with what it was really costing for the individual plants and divisions. There was major discrepancies.

She was also spending a lot of time working on the construction program, the investment program. She was very concerned about inventory and we found that each of the business areas was calculating the inventory for analytical purposes in a different manner. She *got that consolidated* and got everybody using the same approach, got the information so we could tell senior management with the information so the piece added up to the total. She was the main player in the consolidation of the annual business plan that was done this year and also in the strategic plan, financial forecast that was submitted. These are things that she has been work-ing on above and beyond cash flow and over the last, say six months and, I guess, to say one other thing, these are indicative of the things she has been working on.

Q. Speaking of what is indicative, what would be indicative of her work product on the cash flow analysis in terms of a document that would show what it was, what it entailed?

A. She, basically, would provide a cash flow analysis with backup sheets behind the cash flow analysis on a monthly, quarterly and annual basis. She would do cash flow forecasts talking about, you know, how much cash we're going to have and consequently what the debt level of the corporation was going to be going out into the future. In order to effectively do this, she built up a whole—well, it was a combination of her prior knowledge from the job she had in South Charleston where she was very involved with many—with books around capturing many—of these items and also the contacts and expertise she built up working with the treasury department, the tax department and working with all of the individual businesses on extraordinary items that impact cash flow.

\* \* \* \* \* \*

Q. Now, the next thing you mentioned that she had done was employee plans expense?

A. Yes.

Q. Is this for benefit plans?

A. Yeah. It's the accounting for benefit plans.

Q. As a cost of employment for people at given locations; is that right?

A. Yes. Yes.

Q. Now, similarly, if I ask for a representative work product that indicates what she did in that regard for December 1993, would that indicate the nature of the project?

A Well, this is a—this is not an ongoing activity. It's a project activity.

Q Then I could ask for a particular one. Maybe you can tell me what would be a representative project report.

A As a result of the work she did, she completed the project. She made recommendations in a memo which she wrote . . . .

Q. You mentioned some kind of analysis concerning the construction program . . . . What type of analysis was that?

A. She worked with the divisions in functions to determine what the actual construction expenditures had been and what they were projected to be. She then worked to determine whether they can be broken into categories.

[T]he question was how were we doing on construction versus what we had projected we were going to do at the beginning of the year and what were the categories of expenditures, how much was capital, how much was expense, and as I said, what were the different categories. Were they growth-related projects? Were they HS & E-related projects? Were they cost reduction projects, repair and retain or sustain kind of projects?

What it is an analysis to understand where you're spending your money and what the expenditures are consistent with what you said they were going to be. Senior management uses this kind of information to help determine what the capital budget should be.

Q. Did that project similarly result in a report from her?

A. No. She provided me the information . . . but it was not a report as in a typed document. The data was provided to me, and I had a discussion with the president of the corporation about that.

Q. Was it provided to you in written form?

\* \* \* \* \* \*

A. Tabular.

Q. Well is there any document or documents that show the results of this analysis?

A. Yes.

Q. What would that be?

A. There was a presentation that was made to the board of directors over which this was a portion of it.

### Appendix B

Agard Deposition pp. 14, 15

Q. Now, at the time approximately that [Nocturne] came with your unit, my understanding is that Lori Davlos transferred to another unit, correct?

A. She went to specialty chemicals division.

Q. That was also effective January 1, 1994?

A. Effective January, right.

Q. How does what he is going to do compare with what she was doing?

A. He will do in the cash flow area. He will pick up the responsibilities that she had [32] but he will do project work which, based on his experience, background and education, she would not have been able to do.

\* \* \* \* \* \*

Q. So, tell me what types of special projects you have in mind?

A. He will be—the major thing he is doing right now is looking at historical performance plans. He is working on developing metrics and targets for both the corporation and then all the individual businesses within the corporation, and you need a fairly substantial quantitative as in math background in order to be able to do this type of thing. You also need very strong, well, analytical skills also, very strong computer skills.

32. [Footnote by the Court.]
 Agard opined at p. 48 of his deposition that Nocturne would have to learn skills in the cash flow area since he had "not been as closely involved with [it as Davlos.]"

Q. Are you saying that Lori didn't have the requisite qualifications for that work?

A. Her job was much more of an analysis and reporting activity.